The plaintiff sues for $9,650. Plaintiff alleges that on June 20, 1932, he executed *Page 31 
a certain oil, gas and mineral lease on certain properties belonging to him, situated in the Parish of St. Mary, to one Roy B. Siler, which said lease later was acquired by defendant; that defendant eventually drilled on the land described in the lease and was successful in obtaining several producing oil wells, and since the drilling of said wells has continued to operate same under the terms and conditions of the lease granted to defendant's assignor by plaintiff.
Plaintiff further alleges that prior to the drilling for and the discovery of oil on his land, he cautioned the defendant, through its agents and employees, to be very careful in operating under its lease in order that he might be fully protected in preserving his woodland, the streams located on the property, and, in fact, his entire property; that he had been using the property for farming and for raising cattle and that the woodland and streams located on his property were of a high value, not only from an esthetic standpoint, but as grazing land, watering streams for his cattle, timber, pilings, and the general use of woodland. He alleges, further, that "several years ago, the exact date being presently unknown, the defendant, after having completed the drilling of several oil wells, proceeded to allow salt water, waste oil, and other refuse from its drilling operations to flow upon the land into the woods and into the streams owned by petitioner located on the lease referred to hereinabove without making any effort whatsoever to control said salt water, oil, and other refuse from defendant's operations." He alleges that he oftentimes remonstrated with the defendant not to allow this condition to continue, but without avail. That the said discharge of oil, salt water and other refuse from the drilling operations over his land and streams had and is having the effect of killing all vegetation, including all timber, denuding the streams of their beauty and making them useless for watering cattle, as well as successfully killing fish and other life heretofore living in abundance in said streams. He alleges that the defendant has for several years and is continuing to permit salt water, oil and other refuse to flow across his land, contrary to his wishes and against his objections, thereby making the same continuous, day by day up to and including the filing of this suit and that the destruction of his timber and vegetation is and has been gradual and progressive to the extent that approximately forty-five acres of his land have been ruined and denuded. He avers that these acts of defendant were not only acts of negligence, but were committed deliberately and with full knowledge of their serious consequences. He itemizes his damages as follows: Loss of grazing rights on 45 acres of land, $2,700; loss of pleasure and enjoyment in viewing the beauty of petitioner's lands, woods and streams, $1,000; loss to petitioner of pleasure and amusement in fishing in streams polluted by defendant's operations, $1,000; damage to timber, trees, brush and other vegetation than the grazing, $2,250; for trespassing on petitioner's property, $3,000, making a total of $9,950.
Defendant, for answer, admits that plaintiff, as owner, on June 24, 1932, executed a certain oil, gas and mineral lease to Roy B. Siler, which said lease was later transferred to it, and on which property thus leased defendant successfully drilled several oil producing wells. It denies the remainder of plaintiff's allegations.
After the completion of the trial on the merits, and prior to submission of the case, defendant filed a plea of prescription of one year based on the fact that the evidence disclosed that the damages claimed arising from the alleged causes had occurred prior to October 29, 1942, more than a year from the filing of the suit.
The district court sustained the plea of prescription and dismissed plaintiff's suit. Plaintiff has appealed.
[1] At the time the case was argued, but prior to submission, we called to the attention of the attorneys representing plaintiff and defendant that since the case involved a claim of over $2,000 for damages not involving physical injuries that we would have to decline jurisdiction, unless it was admitted that the claim for damages were highly inflated. Whereupon, the attorney for plaintiff entered a remittitur reducing the claim of plaintiff to a sum *Page 32 
not exceeding $2,000. We will retain jurisdiction of the appeal.
The first question to be decided is, from what does the alleged claim sued upon spring? The plaintiff contends it arises ex contractu; while the defendant insists that it arose ex delicto.
The contention of the plaintiff is based on the fact that in the lease there is a clause reading as follows:
"The use of the surface of the land is granted only for the purpose hereof. Grantee shall be responsible for all damages caused by grantee's operations, other than damages necessarily caused by the exploitation of, and operations for minerals thereon."
Regardless of plaintiff's argument to the effect that in his petition, he has alleged "that the operations of defendant were wrongful and caused him great damage, to which he has, from time to time, objected, which said damages were caused to plaintiff * * * on account of defendant's wrongful and unnecessary and wasteful deeds and actions in operating under the lease hereinabove referred to," we do not find the quoted clause in his petition, nor any reference to it. He mentioned the lease as a basis to show the right of defendant to be upon his land for the purpose of exploiting the same for oil. It appears, from the written reason of the trial judge, that plaintiff made this contention by supplemental brief after submission of the case, after defendant had filed the plea of prescription and had submitted its brief in support thereof.
[2-4] Furthermore, for the purpose of determining the question presented, we must look to the entire petition, and not to any detached expression. In the examination of the entire petition to determine whether or not plaintiff bases his cause of action on the Contract of lease, or on one of tort, we must bear in mind the distinction between the two actions. The action on a contract flows from a breach of a special obligation, while an action in tort flows from the violation of a general duty. After a careful review and study of plaintiff's entire petition, we are fully convinced that plaintiff based his action in tort. His complaint is such that it could be made by any property owner against a defendant who permits salt water, waste oil, and other refuse to flow as alleged in his petition. His cause of action is not the kind that is open to him because of his contract of mineral lease with the defendant. The contention of plaintiff that the action is based on a contract is a belated one, purely an after thought on his part. Therefore we are satisfied that the prescriptive period applicable is that of one year as provided for by Civil Code Article 3536.
[5] The facts applicable to the question involved are that in 1938 the first well was brought in as a producer; some six months thereafter the second well was drilled and brought in as a producer. These operations were followed by No. 3 in 1939, and by No. 4 in 1941. According to the plaintiff's petition and his testimony, salt water and waste oil were permitted to flow on his property from the very beginning of defendant's operations, and the killing of his trees and vegetation started from the very beginning, on a small area, increasing as time went on and new oil wells were brought in. He further states that he has been deprived of the use of the land for timber and grazing for some four years, presumably from the date of the trial, which was on December 19, 1944, or some three years from the filing of the suit, which was on October 30, 1943, and that his land had become worthless to him for a period of at least three years prior to his testimony. He estimates that total area affected by the salt water and waste oil was about 40 acres. Although he testified that the denudation of his land and the killing of the timber started from a small area and continuing thereafter, yet nowhere in his testimony does he estimate the small area, nor the progressiveness of the deadening of the timber or the killing of the vegetation from year to year. He states that from the very beginning, that is, the bringing in of well No. 1, he complained to defendant of the discharge of salt water and oil refuse on his property and the effects thereof on the land and timber, and ever so often thereafter. *Page 33 
The testimony of Mack Harrel is to the effect that he frequented the locality of the wells prior to the exploitation for oil, and that plaintiff's land was well timbered; that the result of defendant's operations was the killing of the trees and vegetation. However, he does not state the area or when the deadening started or was completed, merely stating that the timber was dead, almost rotten.
The testimony of Alex Parro, a son of plaintiff, is to the effect that he estimates the spoiled area as containing about 38 acres. He does not state when he noticed the beginning of the deadening of the trees and vegetation. In answer to the question "Don't all these opinions and the dropping of the limbs indicate that it has been for a long time and it is rotten?" he answered: "Yes, there is no doubt that it is rotten."
The testimony of Randolph Parro, another son of plaintiff, is of little value relative to the beginning of the cause of action in that he was absent from the scene of operation at the time of the bringing in of any of the oil wells. According to his testimony, he visited the scene in the latter part of 1942, in October, 1943, and again the day before the trial in December, 1944. The land, on his first visit, was denuded or in the process of denudation. On September 26, 1943, he took pictures of the area at random, three in number, which pictures are in evidence. P-2 is a picture of the dead timber, so is also P-3. He estimates the damaged area as about 39 acres. He estimates the damages as 10% prior to his visit in 1942, and 30% between 1943 and December, 1944. It is to be noted, however, that he does not speak or testify relative to the increase of area, but only of the damages relative to dead timber, underbrush, etc.
The pictures introduced in evidence bear out the testimony of Alex Parro to the effect that the trees are dead and rotten, their present appearance, as shown by these pictures indicating that they have been dead for a long period of time.
Alcee LeBourgeois, defendant's employee, testified that he began working for defendant some 21/2 to 3 years prior to the trial; that at the beginning of his employment, the condition of the land was that it was full of dead trees and that the condition was not any worse at the time of trial than at that time, "no visible change, just all dead."
R.H. Nuttall, a surveyor by profession, and general supervisor of the woodland of Williams, Inc., testified that he had surveyed on August 31, 1944, and plotted a map of the dead area of timber on defendant's land. His plat shows two areas of dead timber and vegetation, 7.03 acres in the northeast and 10.16 in the southwest, the two areas being divided by a roadway, or a total area of 17.19 acres. He cruised the land thoroughly. The trees were dead and rotten, except nineteen cypress trees. There were lots of rotten dead trees and limbs on the ground.
[6] Under the evidence outlined above, we are of the definite conclusion that a greater portion of the damages complained of were sustained long prior to October 30, 1942, more than a year prior to the institution of this suit, and consequently plaintiff's demand for such damages is prescribed under Civil Code, Article 3536. The fact that the damage was continuous did not suspend the prescription, but it ran as the damage occurred.
[7-9] Even if the damages are continuing and progressive, plaintiff cannot postpone the bringing of his action for some time after the year and then sue for the whole damages. In the event that he does bring his action based on continuing and progressive damages, the burden of proof rests on plaintiff to show what part of that damage was sustained after the period fixed for prescription. In the case at bar, plaintiff was called upon to prove the damages he sustained from October 30, 1942, to October 30, 1943, the date of the institution of his suit. The only evidence we can find in the record which might bear on the question is the testimony of his son Randolph Parro. He states that he casually visited the premises in 1940 and 1942. He again visited the premises in September, 1943, and again in December, 1944. He states that he estimates the damages in 1942 at about 10% of the damages as he found them in 1944, and *Page 34 
between September, 1943, to December, 1944, at about 30%, thus leaving an inference that the property was damaged between his visit in 1942 to September 30, 1943, to about 60% of the damage shown in December, 1944. He does not speak of an enlargement of the area, but mostly of the deterioration of the timber and vegetation. He does not claim that he carefully went over the destroyed area or areas at each of his visits, counting the number of trees then dead or in the process of dying. His estimate or opinion of the damages is purely conjectural and is not based on the facts or substantiated by facts found in the record. Plaintiff was called upon to prove his case to a certainty; this he has failed to do.
For these reasons, the judgment appealed from is affirmed.